# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**JAMES HALL and**
**NANCI HALL, h/w**
361 Cranberry Run Road
Zion Grove, PA 17985

v.

**SIG SAUER, INC.**
72 Pease Boulevard
Newington, NH 03801

And

**CABELA'S LLC**
2500 E Kearney St
Springfield, MO 65898

And

**AMERICAN SPORTSMAN HOLDINGS, CO.**
2500 E. Kearney St.
Springfield, MO  65898

And

**BASS PRO SHOPS, INC.**
2500 E. Kearney St.
Springfield, MO  65898

And

**TMBC, LLC**
2500 E. Kearney St.
Springfield MO 65898

And

**BASS PRO OUTDOOR WORLD, LLC**
2500 E Kearney St
Springfield MO 65898

And

**CIVIL CASE NUMBER: 3:23-cv-00978-JFS**

**JURY TRIAL DEMANDED**

**CABELA'S INCORPORATED**
1 Cabela Drive,
Sidney, NE 69160

And

**CABELA'S**
100 Cabela Drive
Hamburg, PA 19526

And

**CABELA'S WHOLESALE INC.**
100 Cabela Drive
Hamburg, PA 19526

*Defendants.*

## COMPLAINT

Plaintiffs, James Hall and Nanci Hall, by and through their counsel, Saltz Mongeluzzi Bendesky, hereby state the following Complaint in Civil Action against the above-captioned Defendants and, in support thereof, aver as follows:

## SUMMARY AND NATURE OF ACTION

1.      Upon the information discovered through research and document production, the Sig Sauer P320 is the most dangerous pistol for its users sold in the United States market.

2.      The Sig Sauer P320 has proven, well-known, video-documented design defects enabling it to discharge when dropped.

3.      Plaintiff, James Hall, spent a career in specialized tactical units in the Philadelphia Police Department and was extremely proficient with firearms at all relevant times.

4.      Mr. Hall trusted Sig Sauer to live up to its reputation as a designer and manufacturer of safe and reliable handguns.

5.      Mr. Hall trusted Sig Sauer to live up to its promise that the P320 "would not fire unless you want it to."

6.      Mr. Hall trusted that the firearms retailer, Cabela's, would not sell him a dangerous and defective firearm after the defects of the P320 were known by Cabela's.

7.      Indeed, after Sig Sauer acknowledged in August of 2017 that the P320 had a drop-fire vulnerability, albeit without disclosing the full extent of the danger or need for a recall, Cabela's continued to sell the P320 which other retailers refused to do.

8.      Mr. Hall was lied to and let down by Sig Sauer and Cabela's, falling victim to the dangerously designed and manufactured P320.

9.      This action seeks actual, compensatory, and punitive damages, and equitable relief, relating to Defendant, Sig Sauer's negligence, defective design, and unfair and deceptive marketing practices regarding a semi-automatic gun.

## PARTIES

10.      Plaintiff, James Hall ("Plaintiff" or "Hall"), is an adult individual, citizen, and resident of the Commonwealth of Pennsylvania, residing at the above-captioned address.

11.      Plaintiff, Nanci Hall ("Plaintiff" or "Mrs. Hall"), the wife of Hall, is an adult individual, citizen, and resident of the Commonwealth of Pennsylvania, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

12.      Defendant, Sig Sauer, Inc. ("Sig" or "Sig Sauer") is a corporation or other business entity with its principal place of business at 72 Pease Boulevard in Newington, New Hampshire 03801, organized and incorporated under the laws of Delaware.

13. Defendant, Cabela's LLC is a corporation or other business entity with its principal place of business at 2500 E Kearney St. Springfield, MO 65898, organized and incorporated under the laws of Delaware.

14. Defendant, American Sportsman Holdings, Co., is a corporation or other business entity with its principal place of business at 2500 E. Kearney St., Springfield MO 65898, and is a successor entity to Bass Pro Shops, Inc.

15. Defendant, Bass Pro Shops, Inc., is a corporation or other business entity with its principal place of business at 2500 E. Kearney St., Springfield MO 65898.

16. Defendant, TMBC, LLC, is a corporation or other business entity with its principal place of business at 2500 E. Kearney St., Springfield MO 65898

17. Defendant, Bass Pro Outdoor World, LLC is a corporation or other business entity with its principal place of business at 2500 E Kearney St Springfield MO 65898

18. Defendant, Cabela's Incorporated is a corporation or other business entity with its principal place of business at 1 Cabela Drive, Sidney, NE 69160, organized and incorporated under the laws of Delaware.

19. Defendant, Cabela's is a corporation or other business entity with its principal place of business at 100 Cabela Drive, Hamburg, PA 19526.

20. Defendant, Cabela's Wholesale Inc., is a corporation or other business entity with its principal place of business at 100 Cabela Drive, Hamburg, PA 19526.

## JURISDICTION & VENUE

21. Jurisdiction is founded on diversity of citizenship pursuant to 28 U.S.C. §1332.

22. Defendant Sig Sauer has a principal place of business in New Hampshire and, accordingly, is a citizen of New Hampshire.

23.     Defendant Sig Sauer does business in and is subject to personal jurisdiction in this judicial district. Defendant has registered to do business in the state of Pennsylvania and therefore is subject to both general jurisdiction and specific jurisdiction due to its conduct and actions within the state.

24.     Defendants Cabela's, LLC, American Sportsman Holdings, Co., Bass Pro Shops, Inc., TMBC, LLC, and Bass Pro Outdoor World, LLC, are business entities each with their principal place of business in Missouri and, accordingly, are a citizens of Missouri.

25.     Defendant Cabela's, Inc. has a principal place of business in Nebraska and, accordingly, is a citizen of Nebraska.

26.     Defendants Cabela's, and Cabela's Wholesale Inc., are business entities each with their principal place of business in Pennsylvania and, accordingly, are a citizens of Pennsylvania.

27.     Defendants, Cabela's, LLC, American Sportsman Holdings, Co., Bass Pro Shops, Inc., TMBC, LLC, Bass Pro Outdoor World, LLC, Cabela's Inc., Cabela's, and Cabela's Wholesale Inc., are believed to own and/or control the Cabella's retail establishment located at 100 Cabela Drive, Hamburg, PA 19526 and shall collectively be referenced in this Complaint as Cabela Defendants.

28.     Cabela Defendants do business in and is subject to personal jurisdiction in this judicial district. Cabela Defendants own and operate the retail establishment, Cabela's located 100 Cabela Drive, Hamburg, PA 19526, which is registered to do business in the state of Pennsylvania and therefore is subject to both general jurisdiction and specific jurisdiction due to Cabela Defendant's conduct and actions within the state.

29.     The amount in controversy substantially exceeds, exclusive of interest and costs, $75,000.

30.     Venue is proper in this judicial district under 28 U.S.C. §1391(b)(2) and (3).

## GENERAL ALLEGATIONS

### I.     SIG SAUER

31.     Sig Sauer designs and manufactures firearms for sale to military and commercial markets throughout the United States and internationally. It markets and sells its products directly and through dealers.

32.     Sig Sauer was formerly known as SIG SAUERARMS Inc. and changed its name to Sig Sauer, Inc. in October 2007. Its Chief Executive Officer at all times relevant to this Complaint was Ron J. Cohen.

33.     The Sig Sauer P320 is susceptible to unintended discharges, meaning instances when a gun fires without user intent, at an alarmingly high rate.

34.     There have been over 150 incidents (and likely multiples more) of the Sig Sauer unintentionally discharging when the user believed they did not pull the trigger, many of which have caused severe injury to the users and/or bystanders.

35.     The vast majority of these users are law enforcement officers, former military personnel, and/or trained and certified gun owners.

36.     At all relevant times, Sig Sauer was acting by and through its employees, servants, and agents, acting within the course and scope of their employment, service and agency.

37.     This action seeks actual, compensatory, and enhanced compensatory damages, and equitable relief, relating to Defendant, Sig Sauer Inc.'s (hereinafter "Defendant" or "Sig Sauer"), negligence, defective design, and unfair and deceptive marketing practices regarding a firearm.

38.     Specifically, this matter involves a striker-fired pistol known as the "P320" that has fired without the trigger being pulled or deliberately actuated by the user, on numerous civilians and law enforcement agents across the nation.

39.     Prior to the incidents detailed below in this Complaint, Sig Sauer received multiple complaints and notifications of P320 pistols firing when the trigger was either not pulled, or not deliberately actuated by the user.

40.     In its "Safety Without Compromise" marketing materials for the P320, Sig Sauer promises:

## SAFETY WITHOUT COMPROMISE

We've designed safety elements into every necessary feature on this pistol. From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to.

41.     Despite this express representation, which Sig Sauer has made for the last several years to the present, the weapon lacks industry-standard safety features and has fired without the user deliberately pulling the trigger many, many times.

42.     Despite this express representation, which Sig Sauer has made for the last several years to the present, the weapon lacks industry-standard safety features and has fired when dropped many, many times.

43.     Defendant Sig Sauer is aware of incidents where the P320 has fired when dropped and has caused injury.

44.     Defendant, Sig Sauer, had knowledge long before the sale of the P320 used by Plaintiff that the P320 - its first ever striker-fired pistol - was capable of firing unintentionally due to defective components and/or the lack of necessary safety features.

45.     For many years since the weapon was first introduced to the market in 2014, Sig Sauer has wantonly failed to recall the P320 despite knowing of scores of grievous wounds inflicted upon users and bystanders.

46.     Years before the incident occurred, through and including the date of Plaintiff's incidents Sig Sauer expressly represented that the weapon could not fire without a trigger pull: "[w]e've designed safety elements into every necessary feature on this pistol.  From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to":



47.     In additional marketing material, under the heading "Striker Safety," Sig Sauer further states: the striker safety "[p]revents the striker from being released unless the trigger is pulled."

48.     At the same time, Sig Sauer contradictorily stated in the original owner's manual for the P320, which warns on page 25, that the weapon could fire if dropped without the trigger being pulled if a round were "chambered," i.e., inside the firing chamber of the weapon's slide.

49.     It is standard operating procedure for many U.S. law enforcement agencies, local police departments, and the military, at a commander's discretion, as well as customary for many private owners, to carry pistols with a chambered round.

50.     Sig Sauer advertises that users can carry the P320 with a round chambered by annotating the P320's capacity in various configurations as "10 + 1," "12 + 1," etc.

51.     The "+ 1" represents a chambered round.

52.     Sig Sauer was aware of the latter fact at the time it designed and manufactured all its pistols, including the P320.  The P320 is the first striker-fired pistol[1] it has ever manufactured.

53.     Sig Sauer assembled the P320 using the same frame from an earlier hammer-fired Sig Sauer model, the P250.

54.     While competing for a $580 million contract to supply the United States Army with a new service pistol in 2016, Sig Sauer's prototype P320s exhibited nearly 200 malfunctions during Army testing.  The Army demanded that Sig Sauer fix all problems associated with the prototype.

---

[1] A striker-fired pistol is different from the traditional "hammer-fired" pistol.  It contains no external hammer to be pulled back by the user; rather, it has an internal "striker" that is held back under spring pressure inside the gun, like a bow and arrow. The P320 is designed so that the rearward movement of the slide places the striker under significant spring tension, making it ready to fire once it is released. The striker is held back by the weapon's sear.  In the below illustrative photo of a typical striker-fired pistol the striker, in red, is held back by the sear, in blue.



55.     The Unites States Army only agreed to the purchase of the P320 after Sig Sauer committed to designing an external manual safety for every military gun sold.

56.     Of the nearly 20 models of non-military P320s, only 1 model offers a manual external safety as an "option."

57.     Sig Sauer's custom-design program allows for hundreds of thousands of different configurations of the P320, but does not allow users to add any type of external safety.

58.     An external manual safety, at the time the subject gun was sold, was certainly technologically feasible for the P320.

59.     A properly functioning and active external manual safety, at the time the subject gun was sold, would preclude a properly functioning P320 from firing in an unintended fashion.

60.     Upon information and belief, every striker-fired pistol on the market is equipped with some type of manual safety; whether it is a thumb safety, tab trigger safety, grip safety, de-cocker, or hinge trigger.

61.     Upon information and belief, Sig Sauer manufactures the only striker-fired pistols on the market that are not equipped with any form of external manual safety.

62.     Upon information and belief, every single-action pistol on the market is equipped with some type of manual safety; whether it is a thumb safety, tab trigger safety, grip safety, de-cocker, or hinge trigger.

63.     Upon information and belief, Sig Sauer manufactures the only single-action pistols on the market that are not equipped with any form of external manual safety.

64.     Sometime after January 2017, when a Connecticut law enforcement agent was shot by a P320 that fell to the ground from less than three feet, Sig Sauer removed the warning on

page 25 from the user manual regarding a chambered round, and replaced it with the following language:



All SIG SAUER pistols incorporate effective mechanical safeties to ensure they only fire when the trigger is pressed. However, like any mechanical device, exposure to acute conditions (e.g. shock, vibration, heavy or repeated drops) may have a negative effect on these safety mechanisms and cause them to fail to work as designed. After suspected exposure to these conditions, have the firearm checked by a certified armorer before using. Mechanical safeties are designed to augment, and not replace safe handling practices.**Careless and improper handling of any firearm can result in unintentional discharge.**

(emphasis in original).

65.     Defendant, Sig Sauer had never before represented that mere "vibration" could cause the weapon to discharge.

66.     Upon information and belief, no other firearms manufacturer has ever made such a representation.

67.     Sig Sauer acknowledges in its own manuals that vibrations can cause its safety mechanisms to fail to work as designed.

68.     Since the P320's manufacture and distribution into the stream of commerce, Sig Sauer has expressly represented that the weapon possessed a "robust safety system":



SAFETY WITHOUT COMPROMISE.

Safety isn't negotiable. The P320 maximizes peace of mind with a robust safety system. Never again will you need to pull the trigger to disassemble your pistol. And, while available as an option, you won't need a tabbed trigger safety for your gun to be drop safe.

FILTER   P320   12 items

69.     Despite their representations, Sig Sauer never made a tabbed trigger safety available as an option for the P320.[2]

70.     In fact, Sig Sauer's original design and manufacture of the P320 rendered the weapon unreasonably dangerous for its intended uses and for any foreseeable uses, including normal carrying, holstering, un-holstering, and/or handling.

71.     When Sig Sauer shipped P320s to dealers for sale to civilian consumers, Sig Sauer knew or should have known that the weapon was defective in its design and unreasonably dangerous for its ordinary uses, intended uses, and all other foreseeable uses and that un-commanded discharges could occur in the ordinary course of using the weapon.

72.     Before Plaintiff purchased his pistols, Sig Sauer was aware of other, prior un-commanded discharges of the P320 platform, and other Sig Sauer pistols, many of which pre-dated their purchases.

73.     In the period between 2012 and 2015, the New York City Police Department reported 10 un-commanded discharges involving Sig Sauer weapons.

---

[2] A tabbed-trigger safety is a small tab within the trigger which must be depressed in order for the entire trigger to be depressed; thus preventing incidental discharges.

74.     In February 2016, a fully-holstered P320 discharged without a trigger pull inside a Roscommon, Michigan Police Officer's vehicle when the officer moved to exit the vehicle during a snowstorm.   The incident was captured on the Officer's body-worn camera.

75.     In 2016, the Surprise, Arizona Police Department complained to Sig Sauer of two separate incidents of P320s firing without trigger pulls.

76.     In October 2016, a P320 fired un-commanded on retired NYPD Officer Thomas Frankenberry in South Carolina, severely injuring him. The spent casing did not eject.

77.     In November 2016, a P320 fired un-commanded on an Officer in Holmes Beach Florida, striking him in his leg.

78.     In 2017, a Sheriff's Deputy in Michigan's Sig Sauer pistol discharged without a trigger pull, striking a schoolteacher in the neck.

79.     On January 5, 2017, a P320 shot a Stamford, Connecticut SWAT team member in his left knee when the pistol fell from a distance of less than three feet to the ground while fully holstered, refuting SIG SAUER's express representations that the weapon is drop safe, cannot fire without a trigger pull and does not require a safety to be drop safe.

80.     On February 28, 2017, a P320 discharged without a trigger pull while in use by the University of Cincinnati Police Department.

81.     On June 14, 2017, a P320 discharged without a trigger pull in Wilsonville, Oregon.

82.     On June 20, 2017, a P320 discharged without a trigger pull while in use by the Howell Township, New Jersey Police Department.

83.     In June of 2017, Sig Sauer shipped approximately 800 P320s to the Loudoun County Sheriff's Department, privately assuring its leadership, Sheriff David Chapman that the

problems with the weapon would be fixed, but that for the time being it had to deal with the weapon as currently manufactured and designed.[3]

84.     On July 28, 2017, a P320 discharged without a trigger pull in Tarrant County, Texas.

85.     On August 4, 2017, the Stamford SWAT team member sued Sig Sauer in U.S. District Court in Connecticut for an un-commanded discharge of a commercial version of the P320 that shot him in his knee.

86.     Four days later, Sig Sauer's CEO released a statement stating: "there have been zero (0) reported drop-related P320 incidents in the U.S. Commercial market."

87.     This statement was false, in view of Sig Sauer's knowledge that Officer Sherperis in Connecticut had been shot by a drop fire some eight months earlier with the commercial version of the P320, and that several other un-commanded discharges of the P320 had occurred before that date.

88.     On August 8, 2017, Sig Sauer announced a "voluntary upgrade" program for the P320 pistol, stating that the pistol meets "rigorous testing protocols for global military and law enforcement agencies" and all "U.S. standard for safety."

89.     This statement was also false, as there are no federal government standards for gun safety, a fact known to Sig Sauer when it issued this press release.

90.     No federal agency oversees how firearms are designed or built. Firearms were expressly exempted by Congress from any federal regulation when it created the Consumer Product Safety Commission in 1972.

---

[3]     As noted *infra*, both a non-upgraded and "upgraded" version of these P320s later fired un-commanded on and hit at least two Loudoun County deputy sheriffs in 2018 and 2019.

91.     Sig Sauer's "upgrade" program, which was presented to the public as purely optional, not urgent, and not mandatory, offered to mark existing commercial versions of the P320 "better" by installing a much lighter trigger, and internal disconnect switch, an improved sear to prevent un-commanded discharges.

92.     On August 9, 2017, the Police Chief of Morrow, Georgia issued an emergency order removing the P320 from service.

93.     In October 2017, a P320 discharged without a trigger pull in Georgia when an officer fell to the ground in pursuit of a suspect. His weapon was holstered and fired simply when he struck the ground.

94.     On November 12, 2017, a P320 discharged without a trigger pull in Dallas County, Texas.

95.     On February 2, 2018, Tyler Herman of McCloud, Oklahoma was removing a holster containing his P320 from his belt. While in the process of removing the holster, and without him touching the trigger, Herman's P320 discharged, striking Herman and causing catastrophic injuries.

96.     On February 7, 2018, Loudoun County, Virginia Deputy Sheriff Marcie Vadnais's P320 fired on her un-commanded in Virginia, severing her right femur causing catastrophic skeletal injury, deformity, three general anesthesia surgeries, severe emotional distress, and related trauma, ending her career. Upon CAT scanning her P320, it was found to have both a design and manufacturing defect: crossed sear springs that apply upward spring pressure to the sear to keep it from releasing the striker.

97.     Months later in April 2018, Sig Sauer issued a second "voluntary upgrade" notice to all users or owners of the P320, but still did not recall the weapon.

98.     In May 2018, civilian Gunter Walker reported to Sig Sauer that his P320 fired on him un-commanded when he placed the weapon down on his nightstand, shooting him through the palm of his left hand.

99.     In June 2018, a Williams County, Ohio Officer reported that his P320 discharged twice in one moment as he was merely attempting to move the slide backward. One round grazed the Officer's arm; the other blew through his patrol car's driver's side door.

100.     In May 2018, a Rancho Cucamonga, California Officer reported that his P320 fired un-commanded merely while he was walking inside his department locker room; the casing of the round did not eject.

101.     In October 2018, a P320 fired un-commanded on Lieutenant Letrell Hayes in Georgia while he was holstering it, causing severe tunneling injuries to his right thigh and calf.

102.     In October 2018, retired Law Enforcement Officer Stephen Mayes' P320 fired un-commanded while seated in its holster, causing severe injury to his right leg.

103.     In December 2018, civilian Robert Lang's P320 fired on him un-commanded and caused serve tunneling wounds to this right leg.

104.     On May 19, 2019, the P320 of Lieutenant Thomas Ahern of the Cambridge, Massachusetts SWAT team fired un-commanded inside a SWAT van with six other occupants while he was working a shift for the annual MayFair event near Harvard Square.

105.     The round struck a cellphone case on Ahern's left leg, deflected into a SWAT gear bag and came to rest in a ballistic helmet, narrowly missing everyone else in the van. The casing of the round did not eject. Lieutenant Ahern is a Sig Sauer certified armorer[4] on the P320.

---

[4] According to Sig Sauer documents, "[t]he SIG SAUER factory armorer certification enables the agency armorer or individual user to completely disassemble, inspect, service, and re-assemble associated weapon systems without voiding the factory warranty. Proper and routine weapon maintenance and inspection of a firearm are essential to ensure maximum reliability. Factory

106.     On July 23, 2019, a P320 fired un-commanded on Officer Walter Collete, Jr. of the Somerville, Massachusetts Police Department hitting him in his leg and causing substantial injuries to his leg.

107.     In August 2019, a Philadelphia Transit Officer Craig Jacklyn's P320 fired un-commanded while fully-holstered, nearly striking a bystander in the subway concourse. The incident was captured on video, and the officer was returned to duty the next day.

108.     The transit authority replaced all Sig Sauer P320s, and later fully exonerated the officer of any alleged wrongdoing in view of the content of the videotape of the incident showing that it fired without a trigger pull. The officer, Craig Jacklyn, later stated:

> This weapon is a hazard. I actually spoke with a lawyer for my situation. Although no one was hurt...someone could have been killed. I'm angry that I was put in a potentially life altering position with a product deemed "safe" by its manufacturer. The fact that officers are carrying this weapon on the job and at home around family thinking it's safe even while resting in its holster has me very angry. Everything that I've told you is documented through 2 Investigative Services. Philadelphia Police Firearms Investigative Unit/ Officer Involved Shooting Incident Unit and SEPTA Transit Police Criminal Investigations Unit. There is station video footage/ body worn camera footage as well.

109.     On September 3, 2019, another P320 in use by the Loudoun County Virginia's Sheriff's Office fired un-commanded on another Loudoun County Deputy Sheriff, Carl Costello, hitting his leg.

110.     On October 10, 2019, Officer Jacques Desrosiers, also of the Cambridge, Massachusetts Police Department, was shot by his P320 without him pulling the trigger. The round caused massive and life-changing injuries to Officer Desrosiers. The spent casing of the round did not eject.

---

armorer courses at SIG SAUER Academy certify agency armorers or individuals to maintain, inspect, service, and repair selected SIG SAUER firearms while preserving the factory warranty. Upon successful completion, armorers will fully understand each firearm and be factory-certified for a period of three years." https://www.Sig Sauersaueracademy.com/course/armorer-certification

111.     On October 11, 2019, a P320 fired un-commanded on Veterans Affairs Police Officer Frank J. Kneski, striking him beneath his lower back as he was un-holstering the weapon. Upon inspection it was found that the spent casing did not eject.

112.     On November 9, 2019, a P320 fired un-commanded on Officer Matthew Gardette of the Manteca, California Police Department as he was getting ready for work. As he merely attempted to place and fasten his duty belt around his waist, the P320 discharged inside the holster.

113.     The holster was a Safariland level three retention holster with a hood securing the pistol. The round blew out the bottom of the holster, impacted the locker room floor, and missed both Officer Gardette and fellow officers by inches as it ricocheted into a locker door.

114.     On December 2, 2019, a P320 fired un-commanded while in the possession of Detective David Albert, also of the Cambridge, Massachusetts Police Department, as he was in the process of putting his duty belt on.

115.     Upon information and belief, employees at Sig Sauer's own training academy in New Hampshire have admitted to un-commanded discharges causing injury in both 2016 and 2017.

116.     On February 15, 2020, Pasco County Florida Sheriff's Deputy David Duff was injured when his P320 discharged without him pulling the trigger while the gun was in its holster on his duty belt.

117.     On February 27, 2020, Tampa Police Department Reserve Office Howard Northrop was severely and permanently injured when his service-issued P320 discharged without a trigger pull, while inside his service-issued holster.

118.     Northrop was struck in the left leg by a 9mm hollow-point bullet, which mushroomed and caused massive internal damage.

119.     On April 15, 2020, Yakima Washington Police Officer Nathan Henyan was injured when his P320 discharged from within its holster without him pulling the trigger.

120.     On June 19, 2020, Army veteran George Abrahams was injured when his P320 discharged without him pulling the trigger.

121.     At the time of Mr. Abrahams's incident, his P320 was contained within the holster which came in the box with his gun, which he was keeping in his pants pocket, which was fully zippered.

122.     On July 14, 2020, Milwaukee Police officer Adam Maritato was injured when his partner's duty-issued P320 discharged from within its holster while the two were attempting to detain a suspect.

123.     On July 27, 2020, ICE Agent Joseph Halase was injured when his P320 discharged without him pulling the trigger while he was holstering the weapon.

124.     In 2020, a Wyoming Highway Patrol officer experienced an unintentional discharge, leading the Wyoming Highway Patrol to abandon the P320 as its standard duty weapon.

125.     On September 21, 2020, a P320 fired un-commanded while in the possession of Deportation Officer Keith Slatowski, of Immigration and Customs Enforcement during a training exercise in New Castle, Delaware.

126.     Slatowski's P320 fired while in its holster, and the casing did not eject.

127.     Slatowski was severely wounded and has not been able to return to duty since the accident as of the date of this filing.

128.     On November 9, 2020, Tampa Police Officer Jerry Wyche was injured when his holstered P320 discharged without him pulling the trigger as he was getting out of his police vehicle.

129.    On December 8, 2020, ICE Agent Catherine Chargualaf was injured when her P320 discharged from within its holster without her pulling the trigger during a training exercise.

130.    On January 23, 2021, civilian Timothy Davis was injured when his Sig Sauer P320 X-Carry discharged in its holster without a trigger pull.

131.    On April 1, 2021, ICE Agent Fernando Armendariz was injured when his duty-issued P320 discharged without his finger touching the trigger while he was in the process of holstering the pistol.

132.    On May 12, 2021, Department of Homeland Security Agent Amy Hendel was injured when her P320 discharged without her pulling the trigger during a training exercise.

133.    On June 2, 2021, Troy, New York Police Officer Michael Colwell suffered permanent injuries when his P320 discharged in his holster during a training exercise while his hands were not touching the gun.

134.    On June 15, 2021, Massachusetts resident Kyle Ellis was injured when her P320 discharged without her pulling the trigger while it was in its holster.

135.    On August 18, 2021, Richmond County Georgia Sheriff's Deputy James Garth was injured when his P320 discharged without him pulling the trigger while he was holstering the weapon.

136.    On November 2, 2021, Florida resident Michael Parker's was injured when his P320 discharged without him pulling the trigger while he was removing the fully holstered P320 from his pocket.

137.    On November 29, 2021, Atlantic County Prosecutor's Office Detective James Scoppa suffered severe tinnitus when his holstered P320 discharged without him pulling the trigger while he was inside of his car.

138.     On December 5, 2021, ICE Agent Mary Doffeny suffered severe emotional harm when her duty-issued P320 discharged from within a dedicated compartment in her purse.

139.     Ms. Doffeny's incident was caught on video, which clearly shows the gun going off without her pulling the trigger.

140.     On January 15, 2022, Connecticut resident Zachary Brown was injured when his P320 discharged from within its holster without Mr. Brown pulling the trigger while he was attempting to remove the holster from his pants.

141.     On February 7, 2022, Honesdale, Pennsylvania Police Officer Donald Thatcher's P320 discharged from its holster while he was exiting his car.

142.     Officer Thatcher's incident was captured on video, which clearly shows that Officer Thatcher's hands were not touching his holster at the time the P320 discharged.

143.     Following this incident, the Honesdale, Pennsylvania Police Department pulled all P320s out of service and sued Sig Sauer for a refund of the firearms.

144.     On February 12, 2022, former Navy Small Arms Instructor Dionicio Delgado was injured when his P320 discharged from within its holster without him pulling the trigger.

145.     On February 26, 2022, Texas resident Juan Duran was injured when his P320 discharged without him pulling the trigger while it was in his holster.

146.     On March 28, 2022, Houston, Texas Police Sergeant Marvin Reyes's P320 discharged from its holster while he was entering his car.

147.     Sergeant Reyes's incident was captured on video, which unmistakably shows that Sergeant Reyes's hands were not near his holster at the time the P320 discharged.

148.     On April 4, 2022, Georgia prosecutor Matthew Breedon was injured when his P320 discharged without him pulling the trigger while he was in the process of removing it from his holster.

149.     On May 25, 2022, former Georgia correctional officer and former Monticello Georgia police officer Dwight Jackson was injured when his holstered P320 discharged without him pulling the trigger.

150.     On September 10, 2022, a Milwaukee Police Officer's holstered P320 discharged while the officer was attempting to detain a suspect.

151.     Following this incident, the third in as many years involving a Milwaukee Police Officer, the Milwaukee Police Association filed a lawsuit against the City of Milwaukee to have the gun removed from service.

152.     In response to the incidents of Milwaukee Police Officers being injured by the P320, Milwaukee Police Chief Jeffrey Norman announced on October 31, 2022 that the Milwaukee Police Department would replace every single P320 in its arsenal with one of Sig Sauer's competitor pistols.

153.     On November 7, 2022, Oklahoma resident Willam Clegg was injured when his P320 discharged from within its holster after making contact with a small wooden paddle.

154.     Between 2015-2022, there have been at least *nine* incidents where an Oklahoma Highway Patrol Officer had a P320 discharge when the officer did not pull the trigger.

155.     Internal documents from Immigration Customs Enforcement provide that unintended discharges skyrocketed within the agency once it switched its primary weapon from a Glock to the P320.

156.     Sig Sauer is aware of other claims of unintended discharges involving the P320 beyond those identified above.

157.     To date, Sig Sauer has never issued a mandatory recall of the P320 for repairs; though it has done so in the past for other of its products with far fewer sales.

## II.     THE DROP FIRE VULNERABILITY OF THE P320

158.     As early as 2013, prior to selling the P320 to American consumers, Sig Sauer was aware that the P320 would fire when dropped at certain angles long before it admitted to these facts publicly.

159.     For years, Sig Sauer disregarded the known drop-fire vulnerabilities of the P320 and failed to adequately and thoroughly test the P320 to understand the cause of the drop-fires and correct the defective design.

160.     In 2016, Sig Sauer submitted exemplar P320 pistols for a German Police solicitation and those P320ies submitted for German testing were drop tested.

161.     The P320ies failed the German drop tests and discharged when dropped at certain angles.

162.     Upon being notified of the failed drop tests, Sig Sauer attempted to identify the drop-fire vulnerability that the German testing revealed.

163.     Sig Sauer identified the drop-fire vulnerability and could repeatedly cause the P320 to discharge when dropped.

164.     Sig began secret re-design of the trigger, and other internal components to address the drop-fire vulnerability in 2016.

165.    Sig Sauer kept the drop-fire vulnerability hidden from the public to avoid any scrutiny or negative press associated with the P320 which it was attempting to sell to the US Army in contract worth over $500 million dollars.

166.    As part of its efforts to sell the P320 to the US Military as part of the Military's Modular Handgun System (MHS), the US Army subjected the P320 to drop testing.[5]

167.    In 2017, the US Army published a report about the MHS program and about its selection of the P320 over the Glock pistol for the MHS contract.

168.    In the report, titled "FY17 Army Programs: XM17/XM18 Modular Handgun System", the Army stated the following:

   a.    The Army selected SIG SAUER's full-size (XM-17) and compact (XM-18) variant pistols for the Army Modular Handgun System (MHS), and awarded a production contract to SIG SAUER on January 19, 2017.

   b.    The Army conducted bid sample testing from February 16 through June 22, 2016, and testing of the P320 in 2017 once it was selected for the MHS program.

   c.    **During drop testing in which an empty primed cartridge was inserted, the striker struck the primer causing a discharge.  SIG SAUER implemented an Engineering Change Proposal (ECP) to correct this deficiency by implementing lightweight components in the trigger group mechanism.**

169.    In 2016, Sig Sauer had already known and identified the drop-fire vulnerability with the P320 and had worked on correcting the deficiency both internally, and in conjunction with the United States Military as the P320 was not drop safe.

170.    In 2017, YouTube videos began surfacing showing individuals who were able to cause a P320 to discharge simply by dropping the gun.

---

[5]    The military variants of the P320 are known as the X-17 and X-18 models.

171.    A competitor of Cabela's, Omaha Outdoors, which sells outdoor goods and firearms, took it upon themselves to see if the rumors were true and endeavored to test the P320 to determine if it was drop safe.

172.    Omaha Outdoors conducted this testing to ensure it was not recommending and selling a defective and dangerous firearm.

173.    While in the midst of its testing, Sig Sauer released a public statement on August 4, 2017 which assured the public that the P320 was, in fact, drop safe.

174.    Sig Sauer's press release provided as follows:

**SIG SAUER Reaffirms Safety of P320 Pistol**

*Striker-fired pistol exceeds safety standards of ANSI/SAAMI® and U.S. military testing*

**Newington, NH (August 4, 2017)** – In response to social media rumors questioning the safety of the P320 pistol, a variant of which was selected by the U.S. government as the U.S. Army's Modular Handgun System (MHS), SIG SAUER, Inc. has full confidence in the reliability, durability and safety of its striker-fired handgun platform. There have been zero (0) reported drop-related P320 incidents in the U.S. commercial market, with hundreds of thousands of guns delivered to date.

The P320 meets and exceeds all U.S. standards for safety, including the American National Standards Institute (ANSI) and Sporting Arms and Ammunition Manufacturers' Institute, Inc. (SAAMI), as well as rigorous testing protocols for global military and law enforcement agencies.

All SIG SAUER pistols incorporate effective mechanical safeties to ensure they only fire when the trigger is pressed. However, like any mechanical device, exposure to acute conditions (e.g. shock, vibration, heavy or repeated drops) may have a negative effect on these safety mechanisms and cause them to not work as designed. This language is common to owner's manuals of major handgun manufacturers.

175.    Andrew Tuohy, of Omaha Outdoors, tested the P320 and identified the same drop fire vulnerability that Sig Sauer had already known about and was in the process of attempting to correct.

176.     Among the various drop-fire vulnerability of the P320, and the various angles that, when dropped, result in a repeatable discharge, Andrew Touhey's testing revealed that the P320 would discharge when dropped on the beavertail of the gun.

177.     Touhey posted his findings to YouTube in a video title "Public Announcement: Sig Sauer P320 Fails Drop Test."

178.     The video shows, time after time, the P320 discharging when dropped on its beavertail with the muzzle pointed upwards as displayed below:



*Omaha Outdoors Video: Published August 7, 2017*
*https://www.youtube.com/watch?v=ch7si_VQsGA&t=1s*

179.     Before publishing the Omaha Outdoors video, Touhey contacted Sig Sauer by email dated August 5, 2017 to notify Sig Sauer of his findings.

180.     Touhey not only identified the drop-fire vulnerability, but that replacing the trigger with a lightweight trigger would greatly reduce the incidence of unintended discharge from

"practically every time it was dropped at that angle" to "practically eliminating" the drop fire vulnerability.

181.    Touhey stated that Sig Sauer "has a responsibility" to fix the drop-fire vulnerability by reducing the weight of the trigger, adding a tabbed-trigger, of addressing the defect with other possible solutions.

182.    Touhey further stated that Omaha Outdoors had sold thousands of P320ies but "**until Sig fixes the problem, <u>we will be suspending sale of the P320 at Omaha Outdoors.</u>**"

183.    In his August 5, 2017 email to Sig Sauer firearms designer, Sean Toner, and to its Director of Marketing and PR, Jordan Hunter, Touhey stated that: "Sig has a responsibility to fix it and to ensure that pistols currently out in the wild are fixed…"

184.    After the release of the Omaha Outdoors video, Sig Sauer was bombarded with negative press and requests for comment.

185.    Sig Sauer again chose to hide from the public the known drop-fire vulnerabilities of the P320 that exceeded those which Touhey discovered.

186.    Sig Sauer decided against issuing a mandatory recall of the P320 and ordering all guns which had shipped to distributors but were not yet sold to be returned to Sig Sauer.

187.    Instead, Sig Sauer continued to parrot its claims that the P320 was safely designed, that the P320 was not defective, and that the P320 needed no modifications.

188.    On August 8, 2017 Sig Sauer announced its "Voluntary Upgrade Program" and offered to provide a free "upgrade" to the defectively designed P320 intended to improve drop safety.

**III.    CABELA'S**

189. Cabela Defendants are a collection of business entities that operate various Cabela's outdoors and sporting goods retail stores throughout the United States, including the Cabela's located at 100 Cabela Drive, Hamburg, PA 19526.

190. Cabela Defendants brand Cabela's as the nation's largest direct marketer, and a leading specialty retailer, of hunting, fishing, camping and related outdoor merchandise.

191. The original Cabela's store was founded in 1961 by Richard and Mary Cabela when they placed an advertisement in a Wyoming newspaper selling fishing flies and grew their fledgling mail-order business selling outdoors equipment.

192. Cabela's grew exponentially since its inception and, in 1995, it launched its own FDIC-insured bank to support its store-branded Visa credit cards.

193. In 2004, after 43 years of being a privately held company, Cabela's launched an initial public offering and sold shares of its common stock to the public at a proposed price of approximately $16 per share.

194. In 2017, Cabela's main competitor, Bass Pro Shops, purchased Cabela's for approximately $4 billion dollars, at roughly $61 per share.

195. One of the products that fueled Cabela's and Cabela Defendant's exponential growth was the sale of firearms.

196. Today, Cabela Defendants operates seventy (70) Cabela's retail stores in the United States, and another ten (10) stores in Canada.

197. Through its stores, its catalogues and its website, Cabela Defendants market and sells handguns, rifles, and shotguns.

198. Cabela Defendants are one of, if not the largest retailer of firearms to American consumers in the country.

199.     In a February 15, 2024 USA Today article authored by Nick Penzenstadler, Cabela's and Bass Pro Shops were identified as the largest sellers of guns used in crimes in the country.

200.     Among the guns that Cabela's retail establishments offered for sale to American consumers in 2017 and 2018, were the Sig Sauer P320, a handgun that was and is uniquely dangerous and which had known design flaws and vulnerabilities that made it extremely dangerous for its owners.

201.     Cabela Defendants were made aware of the dangers posed by the P320 as late as August, 2017, and possibly months and years earlier, but disregarded the safety hazards associated with the P320 and continued to sell the defective P320 to unsuspecting consumers.

202.     Cabela Defendants could have required the defective P320ies in its inventory, which were not equipped the "voluntary upgrade" components, were sent back to Sig Sauer to retrofit the P320ies with components designed to improve drop safety.

203.     Cabela Defendants knew of Sig Sauer's so-called "voluntary upgrade program" where Sig Sauer offered to modify defective P320ies to make them less susceptible to discharging a live round when dropped.

204.     Despite Sig Sauer announcing the "voluntary upgrade program" on August 7, 2017, Cabela Defendants sold Plaintiff James Hall a defective "pre-upgrade" P320 on February 5, 2018 which was not drop safe.

205.     Cabela Defendants sold James Hall a gun that they knew, or should have known was defective and unreasonably dangerous in reckless disregard for his safety, due to the P320's drop-fire vulnerability, and failed to warn James Hall of a drop-fire related issues with the gun.

## JAMES HALL'S INCIDENT

206.     James Hall is a retired Philadelphia Police Lieutenant who served as a police officer for over twenty-five years, and spent sixteen years in specialized tactical units.

207.     Mr. Hall was highly proficient with firearms at all relevant times.

208.     On February 5, 2018, Mr. Hall purchased a Sig Sauer P320 (serial no. 58A116924) from a Cabela's retail establishment owned and operated by Cabela Defendants located in Hamburg, Pennsylvania.

209.     The P320 that Mr. Hall purchased had not been put through the "voluntary upgrade program."

For U.S. domestic consumer purchases, enter your registered P320 serial number below.

✔  Our records indicate that your pistol has not been upgraded. Thank you for your interest in the P320 Voluntary Upgrade Program. We are no longer processing online requests for the Voluntary Upgrade Program. However, we are happy to set this up for you over the phone. Please contact SIG SAUER customer service at 603-610-3000 option 1, M-F, 8:00am – 5:30pm EST and have your serial number available to begin the process. For additional information on the P320 Voluntary Upgrade Program please refer to our FAQ page

**Serial Number ***

58A116924

*Screenshot of Sig Sauer's website taken on December 8, 2022*

210.     On September 22, 2022, Mr. Hall drove home from an billiards club and parked his car in his garage.

211.     Mr. Hall was on his premises at the time.

212.     While on his premises, his P320 fell to the ground, hit the floor and discharged.

213.     The round struck Mr. Hall in his right upper arm and shoulder.

214.     The round shattered Mr. Hall's right shoulder and humorous bone.

215.     Over thirty minutes after calling 911, ambulance arrived and rushed Mr. Hall to the emergency room.

216.     Mr. Hall underwent emergency open-reduction, internal-fixation surgery to repair his shoulder and arm.

217.     Mr. Hall was required to undergo a second surgery to remove several bullet fragments in his shoulder.

218.     Mr. Hall was forced to spend 63 days in an in-patient rehabilitation facility after the incident.

219.     Mr. Hall still has eight bullet fragments remaining in his shoulder that may never be able to be removed.

## COUNT I – NEGLIGENCE
## JAMES HALL V. SIG SAUER

220.     Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

221.     At all relevant times, Sig Sauer owed Mr. Hall the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

222.     At all relevant times, Sig Sauer owed Mr. Hall the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

223.     At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Mr. Hall, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or

had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

224. Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i.   By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

ii.  By failing to use due care in designing the P320 failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii. By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv.  By failing to issue a mandatory recall of the P320 as Sig Sauer had done in the past with other defective products;

v.   By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.  By negligently failing to unambiguously warn purchasers and end users of the gun, including Mr. Hall, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

vii. By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii. By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on

its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

ix. By including a defective and improper holster in the original packaging with the gun;

x. By misrepresenting the dangers and hazards posed by the gun;

xi. By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii. By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii. By failing to incorporate safeties which were standard among all of the P320s competitors;

xiv. Failing to ensure the P320 would not discharge when dropped from a reasonable height;

xv. Other negligent acts and omissions to be developed in the course of discovery.

225. Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

226. The gun's defective condition was not visible and Mr. Hall was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the gun.

227. Sig Sauer's negligence, as alleged in this count, directly and proximately caused the September 20, 2022 unintended discharge and Mr. Hall's injuries resulting from the accident.

228. As a direct and proximate result of the negligence set forth in this Count, Mr. Hall suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the

enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature and Mr. Hall will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against the Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

<u>COUNT II - STRICT PRODUCT LIABILITY</u>
**JAMES HALL V. SIG SAUER**

229.     Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

230.     Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the <u>Restatement (Second) of Torts</u> because:

a.     Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

b.     The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

c.     The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

d.     The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

231.    The P320 was in a defective condition as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

232.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

233.    The defective condition of the P320 caused Plaintiff's injuries.

234.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT III – NEGLIGENCE
### JAMES HALL V. CABELA DEFENDANTS

235.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

236.    At all relevant times, Cabela's owed Mr. Hall the duty to perform reasonable diligence on the products it elected to sell to its customers and to ensure that it did not sell dangerous and defective products that would result in harm to its customers.

237.    At all relevant times, Cabela's owed Mr. Hall the duty to investigate, research, test, and/or inspect the P320 it sold in such a manner and with the exercise of reasonable care, so as to prevent Cabela's from selling a defective gun to its customers.

238.    At all relevant times, Cabela's owed a duty to unambiguously warn its customers and/or intended users of the P320, including Mr. Hall, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Cabela's knew or

had reason to know that the pre-upgrade P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and Sig Sauer's own public statements, as well as other sources of information to be developed in discovery.

239.    Cabela's breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

> i.     By failing to adequately investigate, research, test, and inspect P320ies to determine whether or not they were drop safe;
>
> ii.    By failing to use due care to review information in the public domain that would have confirmed that the pre-upgrade P320 was not drop safe;
>
> iii.   By failing to identify all pre-upgrade P320ies in its inventory and refuse to sell them because they were inherently dangerous and posed a risk of death or serious bodily injury to its customers;
>
> iv.    By failing to identify all pre-upgrade P320ies in its inventory and to return all such guns to Sig Sauer for those guns to receive the enhanced components designed to improve drop-safety before being sold to its customers;
>
> v.     By negligently failing to unambiguously warn purchasers and end users of the gun, including Mr. Hall, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;
>
> vii.   By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of Cabela's, and during which times employees, servants or agents of Cabela's had an opportunity to inspect, service and work on the gun;
>
> viii.  By continuing to sell the pre-upgrade P320 placing more dangerous and defective firearms in the marketplace to be used, sold, and re-sold when Cabela's knew or should have

known that the P320 was unreasonably dangerous and susceptible to unintended discharges;

iv. By selling to Mr. Hall a pre-upgrade P320 in February 2018—5 months after the Sig Sauer announced the VUP and not disclosing to Mr. Hall the existence of the VUP.

xv. Other negligent acts and omissions to be developed in the course of discovery.

240. Cabela's knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

241. The gun's defective condition was not visible and Mr. Hall was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

242. Cabela's negligence, as alleged in this count, directly and proximately caused the September 20, 2022 unintended discharge and Mr. Hall's injuries resulting from the accident.

243. As a direct and proximate result of the negligence set forth in this Count, Mr. Hall suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature and Mr. Hall will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against the Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT IV - STRICT PRODUCT LIABILITY
## JAMES HALL V. CABELA DEFENDANTS

244.     Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

245.     Under Pennsylvania law, a seller of a defective product is strictly liable for the injuries caused by such defect, even if the seller has taken all possible care in the sale and distribution and sale of the product.

246.     Cabela Defendants, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

> e.      Cabela Defendants are engaged in the regular business of selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;
>
> f.      The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Cabela's;
>
> g.      The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;
>
> h.      The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

247.     The P320 was in a defective condition as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

248.     Cabela Defendants breached their duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and reckless in the performance of its obligations.

249. Cabela Defendants breached their duties by selling a product with a design defect and by selling a product without providing Mr. Hall any warnings about the product's danger.

250. Cabela Defendants failed to provide any warnings to Mr. Hall that the pre-upgrade P320 would fire when dropped, had a known drop-fire vulnerability, and that Sig Sauer had created a so-called "voluntary upgrade program" to improve the drop safety of the defectively designed gun.

251. Cabela Defendants, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and reckless in the performance of its obligations.

252. The sale of the P320 in a defective condition, and the Cabela Defendants failure to warn Plaintiff, caused Plaintiff's injuries.

253. Cabela Defendants are therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT V – LOSS OF CONSORTIUM
### NANCI HALL V. ALL DEFENDANTS

254. Plaintiff incorporates by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

255. At all relevant times hereto, Mrs. Hall was the lawfully wedded wife of husband-plaintiff, Mr. Hall, with whom she lives.

256. As a result of the injuries sustained by Mr. Hall, wife-plaintiff Ms. Hall has been and will continue to be deprived of the love, assistance, companionship, consortium and society

of her husband, all to her great loss and detriment.

        **WHEREFORE**, Plaintiff demands judgment in her favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

Respectfully submitted,

**SALTZ MONGELUZZI & BENDESKY P.C.**

By:    */s/ Robert Mongeluzzi*              
        ROBERT MONGELUZZI
        LARRY BENDESKY
        ROBERT W. ZIMMERMAN
        DANIEL L. CEISLER

September 20, 2024