

DELAWARE COUNTY OFFICE
20 WEST THIRD STREET
P.O. BOX 1670
MEDIA, PA 19063
VOICE 610.627.9777
FAX 610.627.9787

ONE LIBERTY PLACE, 52ND FLOOR
1650 MARKET STREET
PHILADELPHIA, PA 19103
VOICE 215.496.8282
FAX 215.496.0999

NEW JERSEY OFFICE
8000 SAGEMORE DRIVE
SUITE 8303
MARLTON, NJ 08053
VOICE 856.751.8383
FAX 856.751.0868

MONTGOMERY COUNTY OFFICE
120 GIBRALTAR RD
SUITE 218
HORSHAM, PA 19044
VOICE 215.496.8282
FAX 215.754.4443

SAMUEL A. HAAZ
DIRECT LINE: 267.297.2766 WORK
SHAAZ@SMBB.COM

May 11, 2026

**_VIA ELECTRONIC FILING_**
The Honorable Joseph F. Saporito
United States District Court
Middle District of Pennsylvania

> **_Re :_**   **James Hall, et al v. Sig Sauer, Inc., et al**
> **Case No.: 3:23-cv-00978-KM**

Judge Saporito,

Plaintiffs regret to inform the Court of several discovery issues in that are still present in this case.  Each issues is identified separately below.  Plaintiff will make themselves available at the Court's convenience should the Court wish to hold a telephone conference or virtual hearing.

### 1.   Contact Information for Those Witnessing or Experiencing a P320 Drop-Fire

On October 28, 2025, the Court ordered Sig Sauer to produce the names and contact information (address and phone numbers) of customers / individuals who were aware of reported P320 drop-fires.  *See* ECF No. 87.  On April 21, 2026, the Court entered an order denying Sig Sauer's motion for reconsideration. The original date upon which Sig was required to comply with the Court's order was November 27, 2025.

Following the Court's April 2026 Order, Plaintiff requested that Sig provide the compelled witness/user information by the end of that week—April 24.  Sig responded by email on April 23 that they expected the production would go out the week of April 27, as Sig Sauer's representative

was on "PTO".

Plaintiff followed up by email on Monday, April 27 asking Sig to confirm when they would produce the compelled information. On April 28, Sig Sauer stated by email "We are compiling the customer contact information, which we will get to you next week"—by May 8, 2026.

It has been twenty days since the Court's Order. Sig Sauer has not provide the customer names and contact information, nor provided any update since April 28.

**2. Discovery Related to New Sig Sauer Witness Affidavits**

On April 10, 2026, Sig Sauer served two affidavits from two corporate designees in this case, Phil Strader and Chris Meyers. The affidavits relate to the deposition of a civilian non-party, Buck Holly, who experienced a P320 drop-fire in May of 2016. He immediately notified Sig Sauer. This drop-fire was never disclosed to Plaintiff in discovery. After Mr. Holly's deposition, Sig Sauer served affidavits stating that they searched their records "and found some limited correspondence with Buck Holly from May 2016." *See* Strader Aff., ¶11.

In light of the disclosure that Sig searched for a located document on which those Affidavits were based, by email dated April 12 Plaintiff requested that Sig produce certain documents, emails, and electronically stored information (ESI) related to Buck Holly's drop-fire incident. Sig Sauer agreed, and on April 28, Sig Sauer stated by email: "We are also working on getting you the production you requested related to Buck Holly, which we will also get to you no later than next week." Sig Sauer has not produced the requested documents.

**3. Improper Redactions In Light of the Court's February 13, 2026 Order**

On February 13, 2026, the Court entered an Opinion and Order that Sig Sauer produce three documents Sig Sauer withheld based upon the work-product doctrine and the attorney client privilege. These documents were not prepared in anticipation of litigation or trial, and did not

2

reflect communications between privileged persons. The documents related to Sig Sauer's marketing and crisis management strategy after the public became aware of the drop-fire defect in August 2017.

On March 5, 2026, Plaintiff invited Sig to produce unredacted documents where those redactions were based upon the same assertions of privilege that this Court rejected. For example, Sig-Hall 5079 contains redactions and is a marketing document titled "P320 Marketing Campaign". It was part of the same group of seven (7) documents attached to a September 2, 2017 email from Teddy Novin, of Kincaid Communications, sent to Allen McCormack and Tom Taylor, both on Sig Sauer's marketing team. Three of the documents this Court ordered Sig produce were attachments to the same email. The relevant portion of Sig-Hall 5079 is depicted below, and attached hereto.



Sig Sauer responded to Plaintiffs' request by email date March 5, 2026, and declined to lift the redactions. Notably, the Court's Order, only permitted redactions for references to "legal" or "counsel" contained in the documents. *See* ECF No. 118, p. 5. Sig Sauer's redacted an entire block of text based on the same misguided assertions of privilege this Court already addressed, and is declining to lift the redactions here.[1]

We thank the Court for its consideration of the issues outlined herein and will make ourselves available for a telephone conference at the Court's convenience.

Respectfully submitted,

**SALTZ MONGELUZZI BENDESKY**

By:     /s/ *Samuel A. Haaz*
Robert W. Zimmerman
Samuel A. Haaz
Ryan D. Hurd
Lily Winter
One Liberty Place
1650 Market Street, 52nd Floor
Philadelphia, PA 19103
Telephone: 215-496-8282
rzimmerman@smbb.com
shaaz@smbb.com
rhurd@smbb.com
lwinter@smbb.com

---

[1] There are other redaction issues that the Plaintiff and Sig Sauer can hopefully work out among themselves and are not yet ripe to bring before the Court. Plaintiff makes reference here only to avoid a suggestion that this is the only issue Plaintiff identified with Sig Sauer's redactions.

**From:** Teddy Novin [tnovin@kincadecommunications.com]
**Sent:** 9/2/2017 11:58:35 AM
**To:** Tom Taylor [/O=SIGSAUERORG/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Tom Taylor933]
**CC:** Allen McCormick [/O=SIGSAUERORG/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Allen McCormick9c6]
**Subject:** Key Docs
**Attachments:** Range Talking Points 320 .docx; GR Talking Points 320 - M17.docx; Customer Talking Points P320.docx; P320 Marketing Campaign (tn).docx; Adminstration-Management All-Hands.docx; Sig Sauer P320 Approach Outline (SAFE).docx; Sig Sauer P320 Approach Outline .docx

Tom,

Attached please find key docs for Wednesday:

(1) Range Talking Points
(2) GR Talking Points
(3) Customer Talking Points (request is in to Matt S. for graphics)
(4) Marketing Campaign Ideas (re. our brainstorm session)
(5) Ron All-Hands script
(6) Original Meeting Outline discussion (SAFE version)
(7) Original Meeting Outline discussion (Private / Detailed version)

Thanks,

Teddy

Teddy Novin
Managing Partner
Kincade Communications

Website: www.kincadecommunications.com
Phone: (202) 253 1860
Email: tnovin@kincadecommunications.com

SIG-HALL 0005072

# Range Talking Points P320

- We've heard that your range is not allowing customers to shoot the Sig Sauer P320.  Is this correct?

- We represent the entire firearms industry, not just Sig Sauer, and I can tell you that the allegations the P320 is not drop safe are completely inaccurate.

- The P320 meets and exceeds all US safety standards as well as many global military and law enforcement protocols.  This includes the American National Standards Institute (ANSI), Sporting Arms & Ammunition Institute (SAAMI), National Institute of Justice (NIJ), and Department of Justice (DOJ).

- We would strongly encourage you to reconsider your decision to ban this pistol.  It's not warranted and sets a very dangerous precedent.

- Like any other firearm, it is possible that if dropped at certain angles and under certain conditions a potential discharge could occur.  This is no different than any other firearm. In fact the existing P320 had better drop testing results than countless other firearms.

- Could you imagine dropping a 1911 or any competition gun with a lighter trigger or an M4?

- This is why drop safety has never been defined as an absolute, but a range of resistance, and the P320 more than qualifies as safe.

- Again, we would strongly encourage you to reconsider your decision to ban this pistol.

## IF ASKED ABOUT THE SIG UPGRADE

- Sig had already planned a P320 running-upgrade later in the year because they found a better way to build the pistol.  This is no surprise because Sig prides itself on innovation and is always focused on optimizing the performance of their firearms.

- When they saw the concern some consumers had following the drop test question, Sig made the decision to transition from a running upgrade later in the year to an immediate and retroactive upgrade now.

- They did this to put any concerns to rest knowing that they were going to upgrade the pistol anyway; not because there was a problem with the existing model – again, there is not.

SIG-HALL 0005073

# GR Talking Points P320-M17

- We recently came under attack following claims that our P320 pistol was not "drop safe" with a loaded round in the chamber.

- These allegations are fundamentally inaccurate.

- Even still, it is important to make clear two very important points:

  - (1) None of the allegations against the P320 pistol affect the M17 pistol, which is a different variant of the P320 platform that has passed the US Army's testing protocols (TOP).

  - (2) While allegations that the P320 isn't drop safe are patently false, Sig Sauer has expedited a planned running upgrade to the pistol that is comprehensive and addresses the erroneous drop-safety concerns. We are also prioritizing this upgrade for LE customers and making it retroactive so that any P320 owner can participate.

- Here is a little more information:

- The P320 in its existing form meets and exceeds all US safety standards as well as many global military and law enforcement protocols. This includes the American National Standards Institute (ANSI), Sporting Arms & Ammunition Institute (SAAMI), National Institute of Justice (NIJ), and Department of Justice (DOJ).

- Like any other firearm, it is possible that if dropped at certain angles and under certain conditions a potential discharge could occur. This is no different than any other firearm. In fact the existing P320 had better drop testing results than countless other firearms.

- Drop safety has never been defined as an absolute, but a range of resistance, and one of many safety criteria of which the P320 stands second to none.

- Fortunately for us, we had already planned to move forward with a P320 running-upgrade later in the year because we recognized a better way to build the pistol. This is no surprise as Sig prides itself on innovation and is always focused on optimizing the engineering and performance of our firearms.

- When we saw the concern some consumers had following the drop test question, we made the decision to transition from a running upgrade later in the year to an immediate and retroactive upgrade now.

- We will always put our customers first, and that's why it was the right decision to offer them the choice of an upgrade even if it was not necessary.

- We expect to send out RMAs between October 1st and the end of December. Once we receive the pistol, it will take four to six weeks to complete the upgrade and return it to the owner.

- With this upgrade, the new P320 is a true industry game-changer and the most innovative pistol on the market.

- Do you have any questions about either the P320 or M17 that I could answer for you?

SIG-HALL 0005075

**Customer Talking Points P320**

- SIG SAUER recently came under attack following claims that its P320 pistol was not "drop safe" with a loaded round in the chamber.

- Those claims are not true. Any firearm with a loaded round in the chamber could potentially discharge if dropped at certain angles and under certain conditions.

- Even though the P320 has passed the country's most stringent safety tests (bulleted below), SIG has offered a free upgrade to customers who still have concerns.
    - The American National Standards Institute (ANSI)
    - Sporting Arms and Ammunition Institute (SAAMI)
    - National Institute of Justice (NIJ)
    - Department of Justice (DOJ)

- If you are interested in the P320 upgrade, here is a graphic of the changes SIG will make to your pistol:

Original P320 Graphic                                    Upgraded P320 Graphic

- If you have any specific questions about the upgrade, you can call SIG SAUER directly at 603-610-3000 or visit their website at SIGSAUER.com.

SIG-HALL 0005077

SIG-HALL 0005078

**THE CAMPAIGN:**

4-part, 135-day campaign to increase overall positive recognition of the P320 and Sig Sauer brand leveraging media partners, customers and consumers.

**SUGGESTED CAMPAIGN NAME/HASHTAGS:**

- #sig4me

- #sigbymyside

- #sigeverywhereigo

- #sigalwaysprepared

- #sigtakeover

- #sigbecauseican

- #sigitsmyright

**PRE-LAUNCH**



**OPENING LAUNCH**

- Sig's site goes dark for 36 hours, static background with a countdown clock for a specific date and time.

- Sig partners begin commenting on social media (re. "what's going on at Sig")

- At target date (TBD) #SIGTAKEOVER (or # below) appears on the Sig Homepage with the following digital scenes:

SIG-HALL 0005079

**DIGIGAL DESCRIPTION:**

10 sec scenes, static between scenes and verbiage in all caps and bold for each scene:

- Scene 1: Soldier w/ a Sig on his side, sun setting, desert terrain (SIG MODULARITY)

- Scene 2: Professional shooter in action on the range (SIG PERFORMANCE)

- Scene 3: Female jogger (SIG RELIABILITY)

- Scene 4: LE officer leaned over the hood of a car aiming Sig at suspect – suspect blurred in the distance (SIG PRECISION)

- Scene 5: B-roll from manufacturing (SIG QUALITY)

- Scene 6: Static background continues and "WAIT FOR IT" appears, as it fades #SIGTAKEOVER consumes the screen
- Scene 7: Personality explains #SIGTAKEOVER contest/campaign


**THE CONTEST:**
4-part contest to extend over 135 days from launch

<mark>Part 1:</mark> Sig supplies a P320, ammunition, and promotional materials to 30-50 business and media partners for a social media contest that will run simultaneously across partner social media platforms for 30 days.

- To enter the contest, the consumer must include #SIGTAKEOVER and #CUSTOMERSCHOICE (e..g., #CABELAS, #TEAMCABELAS, #SIGCABELAS, etc.)

- On the 30th day business partners announce winners at designated times.

Timeline: Days 1-30


<mark>Part 2:</mark> 15 days from Part 1 announcement (Day 45), Sig chooses 5 winners from all the contest finalists for an all-expense paid trip to SIG Academy for a training weekend.

- After Sig announces the five winners via social media we tease consumers with a notice that Part 3 is coming and they should stay tuned to Sig and Sig Partner social media for a major announcement in 15 days (Day 60), at 3:20pm.

Timeline: Day 45-60

SIG-HALL 0005080

<mark>Part 3:</mark>  Day 60 an instant rebate is announced at chains for first 100 customers on X day (schedule for the next Saturday after day 60) on the P320 for $150.

- Facebook live takeover announcement – Sig employee goes live on chain account Facebook pages to announce rebate

- Instant rebate given at the counter

- Sig designs social media posts for partners to promote the live announcement

- In a soft market, chain partners will appreciate the push to their stores

<mark>Part 4:</mark>  Day 75 announce final contest to run 60 days – Start date X – end date X – Sig searches for company spokesperson – minimal commitments/contract mandatory, suggested 1 year

- Utilize partners and print magazines to advertise contest

- To enter contestants must submit a video via social media/YouTube, use #SIGTAKEOVER.

- Video entry
  - Introduction
  - Range time
  - Why Sig?

- Sig chooses the top 5 or 10 contestants and posts their videos on the Sig website. We can work with them to build a strong "campaign" and generate even more following.

- Consumers vote on a winner via social media

Timeline: 2 months (Day 75 – Day 135)

SIG-HALL 0005081